# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | No: 2:11 CR 13 |
| | ) | |
| MICHAEL J. WEATHERFORD. | ) | |

## OPINION AND ORDER

## I. PROCEDURAL BACKGROUND

On January 20, 2011, defendant was indicted on one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (DE # 5.) On March 17, 2011, defendant filed a "Motion to Suppress and Reject." (DE # 29.) Defendant moved to suppress any statements and or physical items taken from defendant on November 6, 2010. (*Id.*) On March 31, 2011, the government filed a response to defendant's motion to suppress. (DE # 36.) A suppression hearing was held on October 27, 2011, and the court orally denied in full defendant's motion to suppress. The court now issues this opinion detailing the factual and legal bases for that decision.

## II. FINDINGS OF FACT[1]

At the October 11, 2007, suppression hearing, Officer Joshua Schoon and Officer Brian Hultquist testified. Both Schoon and Hultquist are Indiana Conservation Officers. Hultquist has worked for the Indiana Department of Natural Resources for thirty-one years. He attended both the Indiana Conservation Officer Academy and the Indiana

---

[1] All facts are taken from testimony given by Officer Joshua Schoon and Officer Brian Hultquist at the October 27, 2011, suppression hearing.

State Law Enforcement Academy. The court finds both Officer Schoon's and Officer Hultquist's testimony credible. At the suppression hearing, the government introduced exhibits. Cross examination took place, and defendant's counsel cross examined both Officer Schoon and Officer Hultquist.

The first contact between Officer Schoon and Officer Hultquist about defendant occurred on November, 4, 2007, in an email describing a Michael Weatherford, a convicted felon, that was using a firearm to hunt. Officer Schoon gathered this information from defendant's neighbor, Jim Clark. Clark had initially called Schoon to complain about the Weatherford family dumping deer parts on his property in November 2006. During this conversation, Clark also told Schoon that Michael Weatherford was a convicted felon and that Weatherford was using a firearm to hunt out of season. Clark would call Schoon from time to time to inform him about the comings and goings of Weatherford during hunting season.

On October 30, 2007, during archery season, Officer Hultquist encountered a Florida Conservation Officer who had been hunting. The Florida Conservation Officer told Hultquist he had heard firearms being fired in the area. This prompted Hultquist to email Schoon about the noises. The response Schoon emailed to Hultquist informed Hultquist about the information Schoon had gotten from Clark, informing Hultquist about Michael Weatherford, a convicted felon, using a firearm to hunt near the area the shots had been heard. Schoon also informed Hultquist that Michael Weatherford had

been hunting on Rick Gate's property. Hultquist testified that it is illegal to hunt deer with a rifle during archery season.

After receiving this information, Officer Hultquist went to Rick Gate's property to investigate. Officer Hultquist did not find anyone there; however, he did find a tree stand for hunting, a spent .270 caliber rifle casing,[2] and two spent Remington 20 gauge shotgun casings.[3] These findings suggested to Hultquist that someone was hunting out of season.

Officer Hulquist's next visit to Rick Gate's property was in September 2008 (prior to the start of firearms season). Although he once again found no people at the location, he did observe a second tree stand and collected "bite size candy wrappers," an empty vanilla coke can, and an empty Winston cigarette package under the second tree stand. He considered these items to be "recent." The stand faced the crop field, where deer would often come to feed. The second stand also had a gun rest.

Officer Hultquist again visited Rick Gate's property in September 2009 (prior to the start of firearms season), when he observed that the second tree stand had changed locations from the edge of the woods to the center of the woods. He also recovered a Vanilla Coke can, a Winston cigarette butt, and several bite sized candy wrappers. Hultquist described the condition of these items as "recent."

--------

[2] Officer Hultquist testified that .270 caliber ammunition is not allowed to hunt deer during any season.

[3] The shells were recovered prior to firearms season.

Officer Hultquist next visited Rick Gate's property in March of 2010, locating a "recently" spent .270 caliber casing from under the second stand. Hultquist visited Rick Gate's property again in September 2010. Officer Hultquist observed that the second tree stand had been moved again. He also observed a third tree stand resting on the ground where the second stand used to be - a plastic "Little Tykes" playhouse that had been painted camouflage. The playhouse was very small, and Officer Hultquist believed that the windows were likely too small for a compound bow hunter to hunt from. However, he did believe it was big enough for a hunter to hunt from using a firearm. After crawling into the playhouse Officer Hultquist observed a paper plate hanging from a tree located across the crop field. Hultquist moved closer to the plate, and saw that it had two holes in it. He believed these were recent bullet holes made by a rifle. He also believed the third tree stand, the playhouse, was going to be used to hunt from. He considered all of this part of his investigation of the person who he believed was hunting with a firearm out of season.

On October 31, 2010, before firearms season had begun, Officer Schoon called Officer Hultquist and left a voicemail message informing Hultquist that Clark had reported a Weatherford friend or family member was loading up an All Terrain Vehicle ("ATV") on a pickup and might be headed to Rick Gate's property to hunt.

On the next day, November 1, 2010 (prior to the start of deer hunting season), Officer Hultquist went back to Rick Gate's property and observed that the first and second tree stands had not been moved, but the third tree stand, the playhouse, was

now in a tree, with a ladder leading to the entrance, and a chair and carpet placed inside the playhouse. There were also ATV tracks nearby.

On November 6, 2010, Officer Hultquist again visited Rick Gate's property. He was fully dressed in his DNR uniform and also had a baseball hat on that had "Indiana Conservation Officer" embroidered on the front of it. He first noticed deer moving away from the tree stands, which alerted him to the presence of a hunter. Then, through his binoculars, he noticed a white male wearing camouflage facing the crop field sitting in the playhouse. The man was facing the same direction as the paper plate Hultquist had previously observed. Hultquist believed, given the info he had received from Officer Schoon and his investigation up to that point, that the person in the stand was illegally hunting with a firearm during archery season.

Officer Hultquist got his firearm in "ready position" and instructed the defendant to get out of the playhouse, leave everything he had in the tree stand, and step into the crop field. The firearm was pointed away from defendant. Officer Hultquist put away his gun at this point. Defendant questioned Officer Hultquist about who Hultquist was and denied he was hunting, and Hultquist asked to see defendant's hunting license. Hultquist noticed, with the exception of a camouflage jacket, defendant had no archery hunting accessories with him. Defendant took three steps toward the field, and then changed directions and started walking into the woods at a quick pace. Officer Hultquist radioed dispatch to inform them of what was happening.

Officer Hultquist caught up with defendant rather quickly, and defendant again claimed that he was not hunting, but that he was watching the property to keep hunters off of it at the landowner's request. Hultquist asked defendant for his license and identification. Defendant told Officer Hultquist his name was "Brian Jones," and told Officer Hultquist he had no identification with him, but offered to get his wife who defendant said was nearby.

Officer Hulquist and defendant then walked to the crop field where Hultquist observed a pickup truck that he believed belonged to defendant. Hultquist told defendant to call his wife, but defendant said he did not have a phone. Defendant appeared nervous and Hultquist provided defendant with his DNR ID card, identifying himself as an Indiana Conservation Officer. Defendant moved toward the truck, and Officer Hultquist positioned himself between defendant and the truck to prevent defendant from taking off. Hultquist was not going to let defendant leave before Hultquist had a chance to determine defendant's identity.

Hultquist then ordered defendant to take his jacket off, because he believed the defendant was armed. Defendant ignored this request, Hultquist asked again, and defendant again ignored the instruction. Defendant took a step toward the truck, Hultquist then stepped toward defendant, and defendant attempted to punch Hultquist. Hultquist caught defendant's arm to prevent the punch and attempted to take defendant to the ground. Hultquist held onto defendant's arm. During the struggle, defendant pulled out what Hultquist believed to be a gun and raised it to

Hultquist's head. Hultquist did not know it at the time, but he subsequently knocked the gun out of defendant's hand during the struggle. Hultquist got the defendant on the ground, and ordered defendant to give Hultquist his right arm. Hultquist was trying to get control over the firearm, as he did not know where it was at that point, and he feared defendant had control of it with his right arm, which was underneath his body. Defendant also bit Hultquist's left wrist at this point.

Once Hultquist got defendant under control, Hultquist handcuffed him and then radioed dispatch and waited for backup to arrive. While waiting for backup, defendant complained of pain and Hultquist attempted to place him in a more comfortable position where he could breathe more easily. Hulquist asked defendant for his name and also asked several other questions about his medical history. Defendant identified himself as Michael Weatherford. Once the backup arrived, defendant was placed in a second set of handcuffs for comfort and was given his *Miranda* warnings, which he acknowledged understanding. A pat-down of defendant by Attica Police Officer Tommy Galloway recovered a cell phone and knife, and officers found a bottle of deer attractant and several bite sized candies in defendant's coat. Officer Hultquist then went back to the playhouse, recovering a Remington .270 caliber rifle, the use of which to hunt deer is illegal, and a partially full can of Vanilla Coke.

Officer Hultquist spoke with Weatherford on November 7, 2010, at the Warren County Sheriff's Department. Hultquist first asked to see defendant's hands and wrists because defendant had complained of injuries. Hultquist then asked defendant if he

remembered the events from the previous evening, including seeing an Indiana Conservation Officer, and defendant said he did not. Defendant then asked for his attorney, and the questioning stopped. Hultquist submitted written report and charges were filed by the state of Indiana.

## III. ARGUMENTS

Defendant put forth two primary arguments in his motion to suppress. Defendant first argued that from its initiation, Officer Hulquist's contact with the defendant constituted a custodial arrest, and that there was no probable cause for a custodial detention. (DE # 29 at 3.) Defendant contended that Officer Hulquist had only vague information about the possibility of someone hunting with a firearm during archery season, that someone sitting in the blind is not inconsistent with bow hunting, and that there was no evidence to support the conclusion that Weatherford was the person in the blind. (*Id.* at 3-4.) Defendant argued this violated the Fourth Amendment. (*Id.* at 4.)

Second, defendant argued that because his detention was a full custodial arrest, *Miranda* warnings were required to be given to defendant. (*Id.*) Defendant contended there was an ongoing investigation including an interrogation of the defendant after his custodial detention. (*Id.*)

The government contended that Officer Hultquist conducted a valid investigatory stop (*Terry* stop), arguing that he "[had] reasonable suspicion of illegal hunting to conduct a *Terry* stop of Weatherford." (DE # 36 at 12.) Additionally, the

government argued that Officer Hultquist's request that defendant remove his jacket was a limited intrusion and was reasonable in scope. (*Id.* at 18.) The government's next argument was that probable cause existed for defendant's arrest for attempted battery and resisting law enforcement. (*Id.* at 21.) The government's final argument was that Officer Hultquist was not required to read defendant *Miranda* warnings prior to his arrest for resisting law enforcement. (*Id.* at 24.)

## IV. ANALYSIS

The Fourth Amendment protects against "unreasonable searches and seizures." *United States v. Scheets*, 188 F.3d 829, 836 (7th Cir. 1999) (citing U.S. CONST. Amend. IV). However, not all police-citizen encounters implicate Fourth Amendment protections against unreasonable searches and seizures. *Id.* The Seventh Circuit has recognized three categories of police-citizen encounters: 1) arrest, requiring police to have probable cause to believe the person has committed a crime or is committing a crime, 2) investigatory stop, limited to a brief non-intrusive detention, based on reasonable suspicion that the person has committed or is committing a crime (often referred to as a *Terry* stop), and 3) "an officer seeking the citizen's voluntary cooperation through non-coercive questioning" (not a seizure within the Fourth Amendment). *Id.* (italics added) (citing *United States v. Johnson*, 910 F.2d 1506, 1508 (7th Cir. 1990)).

Because not all police-citizen encounters implicate the Fourth Amendment, the threshold question is whether a seizure has occurred. *United States v. Borys*, 766 F.2d 304, 308 (7th Cir. 1985) (citing *Florida v. Royer*, 460 U.S. 491, 497-98 (1983); *Terry*, 392 U.S.

at 19 n.16; *United States v. Morgan*, 725 F.2d 56, 58-59 (7th Cir. 1984)). Once it is determined that a person has been seized, the court determines whether under a totality of the circumstances, the seizure was objectively unreasonable. *Scheets*, 188 F.3d at 836.

The first issue a court must determine is when defendant was actually "seized" for purposes of the Fourth Amendment. The test for when an encounter between a law enforcement officer and a citizen rises to the level of a seizure is an objective one. *United States v. Espinosa-Alvarez*, 839 F.2d 1201, 1205 (7th Cir. 1988). Under the Fourth Amendment, a seizure occurs when "a reasonable person in the position of the defendant would believe that his liberty has been restrained." *United States v. Lewis*, 608 F.3d 996, 1000 (7th Cir. 2010). The government argued that this was a *Terry* stop, and defendant argued that this was a full custodial arrest; therefore, neither party disputed this was a seizure, as both a *Terry* stop and a custodial arrest are seizures under the Fourth Amendment. *United States v. Ford*, 333 F.3d 839, 844 (7th Cir. 2003).

The Constitution permits a police officer to conduct an investigatory stop (also known as a "*Terry* stop") that demands only a limited intrusion into the person's privacy, so long as that stop is based on "'specific and articulable facts, which taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *United States v. Baskin*, 401 F.3d 788, 791 (7th Cir. 2005) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). In other words, a *Terry* stop is permissible where the police officer has "reasonable suspicion, supported by articulable facts, that criminal activity is afoot." *Id.* In making a reasonable suspicion assessment, "'it is imperative that the facts be judged

against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *United States v. Mancillas*, 183 F.3d 682, 695-96 (7th Cir. 1998) (quoting *Terry*, 392 U.S. at 21-22). The real issue is whether the police officer's conduct was reasonable, given the officer's suspicions and the surrounding circumstances. *Id*.

The decision to make the *Terry* stop "must have been justified at its inception." *Baskin*, 401 F.3d at 791. It must also be "reasonable in scope and duration and officers are permitted to take reasonable steps to insure their own safety." *United States v. Jackson*, 300 F.3d 740, 746 (7th Cir. 2002) (citing *Terry*, 392 U.S. at 30). "Accordingly, the search must 'be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs or other hidden instruments for the assault of the police officer.'" *Id*. (quoting *Terry*, 392 U.S. at 29). The length and scope of an individual's detention must be tailored to the stop's underlying justification. *See Scheets*, 188 F.3d at 838. Courts must assess whether the police officers "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharp*, 470 U.S. 675, 686 (1985). Whether an investigatory stop is lawful depends on whether, under a totality of the circumstances, the officers' conduct was objectively reasonable. *Mancillas*, 183 F.3d at 695-96. This includes the experience of the officers and the behavior of the defendant. *United States v. Swift*, 220 F.3d 502, 506 (7th Cir. 2000).

The Supreme Court has stated that reasonable suspicion is a much lower standard than the "fair probability" requirement of probable cause. *United States v. Sokolow*, 490 U.S. 1, 7 (1989) ("We have held that probable cause means 'a fair probability that contraband or evidence of a crime will be found,' . . . and the level of suspicion required for a *Terry* stop is obviously less demanding than that for probable cause . . . .") (internal citations omitted); *see also Alabama v. White*, 496 U.S. 325, 330 (1990) ("Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause."). "Reasonable suspicion has been defined as 'some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity.'" *United States v. Ienco*, 182 F.3d 517, 523 (7th Cir. 1999) (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)).

In determining whether the *Terry* stop was reasonable, courts must first determine if the law enforcement officer's actions were justified at the inception of the encounter, and then determine whether the actions taken were reasonably related in scope to the circumstances which justified the stop in the first place. *Id*. In examining these two issues, courts look to "'whether the police were aware of specific and articulable facts giving rise to reasonable suspicion; and . . . whether the degree of

intrusion was reasonably related to the known facts.'" *United States v. Duguay*, 93 F.3d 346, 350 (7th Cir. 1996).

For example, in *United States v. Riley*, a police officer was driving around to different banks investigating a possible bank robbery when he saw a car, engine running, backed into a parking space at a restaurant located adjacent to the bank. 493 F.3d 803, 805 (7th Cir. 2007). The driver was looking at the door of the bank, and a man, carrying something that the police officer could not make out, came out of the bank and got into the parked car. *Id.* The passenger and driver stopped at a gas station a few blocks away to switch positions in the car. *Id.* The court noted the police officer had prior experience in bank robberies and had noticed suspicious behavior: the officer knew that it was common for bank robbers to back into spots close, but not actually in a bank parking lot; the fact that the driver was focused on the bank door indicated he was driving the "getaway" car; and the fact that the engine was running. *Id.* at 808-09. The court held that this behavior, combined with the suspicious driver switch at the gas station, would allow an experienced officer in this police officer's position to conclude these individuals had engaged in criminal activity, and therefore, a *Terry* stop was justified. *Id.* at 809-10.

Similarly, in *United States v. Mancillas*, a police officer got a report of an anonymous tip at about 1:30 a.m. describing a Hispanic male with a gun in his hand sitting in a blue Mercedes in the parking lot of a local nightclub. *Mancillas*, 183 F.3d at 686. The officer drove to the nightclub and immediately spotted the blue Mercedes. *Id.*

13

The officer directed his spotlight at the car, and three males exited the vehicle, walking in different directions. *Id.* Only one walked toward the nightclub, which was the only business in the area open at that time. *Id.* The officer drew his gun, and ordered all of the suspects back to the car. *Id.* The defendant argued the officer lacked reasonable suspicion to make a *Terry* stop. *Id.* at 696. The Seventh Circuit disagreed, and found reasonable suspicion existed, noting that the officer corroborated the tip after seeing the blue Mercedes in the parking lot and the suspect's suspicious behavior upon exiting the vehicle. *Id.* at 698.

Contrast *Riley* and *Mancillas* with *United States v. Packer*, where the Seventh Circuit found reasonable suspicion to be lacking. 15 F.3d 654, 659 (7th Cir. 1994). In that case, police got an anonymous call around 1:00 a.m., reporting a suspicious vehicle containing four black males parked on a residential street. *Id.* at 655. Two police cruisers converged on the vehicle in a way that blocked an easy exit. *Id.* The police eventually discovered a gun on the defendant, and he was convicted of being a felon in possession of a firearm. *Id.* The defendant argued the police lacked the reasonable suspicion necessary for a *Terry* stop. *Id.* at 657. The court focused on the fact that the tip police received did not identify any sort of illegal conduct, but only reported a "suspicious" car. *Id.* at 659. Thus, the police did not have any "particularized suspicion of criminal conduct." *Id.*

Applying the law to the facts of this case, the initial stop was justified at its inception, as there was testimony that hunting with a firearm during archery season is a

crime in Indiana. Unlike in *Packer*, Officer Hultquist was not investigating general "suspicious" behavior. Rather, he had been investigating someone illegally hunting with a firearm during archery season for a very long time. Hultquist had gathered evidence that a firearm was being used prior to the start of firearm season. Hultquist had the information from the Florida conservation officer that shots were being fired in the area before firearms season. Hultquist had recovered spent shotgun shells and rifle casings prior to the start of firearms season. He found rifle casings prior to the start of deer hunting season that he considered to be "recently spent." Hultquist recovered vanilla coke cans and bite size candy wrappers on the property before firearm season. He believed these items had been consumed recently. He observed the tree stands change locations. Hultquist found the Little Tykes playhouse prior to deer hunting season, facing the crop field, and also found the paper plate that had what he believed to be bullet holes. The playhouse was also facing the paper plate. He also believed that the playhouse was too small for a bow hunter using a compound bow to use for hunting. Hultquist also noticed the playhouse had been moved into an elevated position, which is commonly used for hunting deer. Hultquist also observed a ladder leading up to the playhouse and a chair inside the playhouse, both prior to the start of firearms season. As in the *Riley* case, the totality of the circumstances could lead an experienced officer, like Hultquist, to conclude that the criminal activity of hunting with a firearm during archery season was afoot. Therefore, Hultquist had reasonable suspicion to justify a *Terry* stop.

With regard to the second prong of the *Terry* stop analysis, the court must determine whether the actions taken were reasonably related in scope to the circumstances which justified the stop in the first place. *Ienco*, 182 F.3d at 523. The Supreme Court has stated: "Much as a 'bright line' rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria." *Sharp*, 470 U.S. at 685.

In *United States v. Shoals*, the defendant argued the police exceeded the bounds of a *Terry* stop by ordering him to exit a house, having their guns drawn, and placing handcuffs on him. 478 F.3d 850, 853 (7th Cir. 2007). The court found that the tactics the police used were warranted given the inherent danger of the encounter; the police were responding to a 911 call about someone discharging a gun. *Id.* Other cases have found reasonable *Terry* stops where officer safety has been threatened. *See United States v. Felix-Felix*, 275 F.3d 627, 633 (7th Cir. 2001) (*Terry* stop can include pat down search), *superseded on other grounds by statute as recognized in United States v. Rodriguez-Cardenas*, 362 F.3d 958 (7th Cir. 2004); *United States v. Vega*, 72 F.3d 507, 515-16 (7th Cir. 1995) (finding a reasonable *Terry* stop even though officers drew their guns and the stop lasted over an hour).

In this case, Officer Hultquist suspected defendant was hunting with a firearm during archery season. Hultquist had reasonable suspicion to believe defendant had a gun on him. The requests Hultquist made asking defendant to come down from the stand, step into the soy bean field, and take his jacket off were all reasonable under the

circumstances. These requests are less intrusive than handcuffing someone, as the court in *Shoals* found to be warranted under *Terry*. *Terry* searches help ensure officer safety, and in this case, Hultquist's safety was at risk because he was dealing with someone who he believed to be hunting with a firearm. *See United States v. Ocampo*, 890 F.2d 1363, 1369 (7th Cir. 1989) ("In general, officers may take such steps as are 'reasonably necessary to protect their personal safety and to maintain the status quo' so that the limited purposes of the stop may be achieved.") (quoting *United States v. Hensley*, 469 U.S. 221, 235 (1985)). The Seventh Circuit has stated "some crimes by their very nature are so suggestive of the presence and use of weapons that a frisk is always reasonable when officers have reasonable suspicion that an individual might be involved in such a crime." *United States v. Barnett*, 505 F.3d 637, 640 (7th Cir. 2007) (referencing bank robberies and other violent crimes where suspect was likely to have weapon). Here, Hultquist believed defendant was hunting with a firearm. Asking defendant to take his jacket off was less intrusive than a frisk, and was reasonable under the circumstances.

The duration of the encounter, which according to the government's brief (DE # 36 at 28), lasted less than ten minutes, does not make the *Terry* stop unreasonable. *See Cady v. Sheahan*, 467 F.3d 1057, 1063 ("When delay is attributable to the evasive actions of a suspect, the police do not exceed the permissible duration of an investigatory stop."). Defendant was being evasive, and therefore the ten minutes the stop lasted was not unreasonable. In sum, Hultquist conducted a reasonable *Terry* stop, and everything he asked defendant to do was within the permissible scope of that stop.

Because Officer Hultquist conducted a valid *Terry* stop, the next issue is when the encounter turned into an arrest. Defendant asserted that the encounter between Officer Hultquist and defendant was a custodial arrest from its inception, and there was no probable cause to warrant a custodial arrest. (DE # 29 at 3-4.)

"A seizure becomes an arrest when 'a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest.'" *Ienco*, 182 F.3d at 523 (quoting *United States v. Corral–Franco*, 848 F.2d 536, 540 (5th Cir.1988)). If a suspect is not formally arrested, the suspect can show that he was under custodial arrest by demonstrating that "he or she was subjected to restraints of freedom such that the conditions of a formal arrest were closely approximated or actually attained." *United States v. Lennick*, 917 F.2d 974, 977 (7th Cir. 1990). "[T]he test is not whether the defendant was under a subjective belief that his or her movements were restricted, but whether a reasonable person in the defendant's position would believe that he or she was free to leave." *Id.* Courts use a totality of the circumstances test to determine if a reasonable person would feel free to leave, looking at factors such as the length of the interrogation, the place that the interrogation occurred, and the purpose behind the interrogation. *Id.* Because defendant claimed he was under arrest from the start of the encounter, and his formal arrest did not occur until much later, defendant needed to show that he was under custodial arrest by demonstrating that arrest and that "a

reasonable person in his position would have believed that he or she was not free to ignore [the law enforcement officer] and walk away." *Id.*

Numerous factors play into a court's analysis of whether an individual is in custody. In *United States v. Wyatt*, the defendant was asked by law enforcement officers to exit a bar and the officers questioned the defendant once outside. 179 F.3d 532, 536-37 (7th Cir. 1999). Defendant argued that he was in custody once the questioning started outside the bar, but the Seventh Circuit did not agree. *Id.* 536. The court considered several factors in reaching this conclusion: the defendant was asked, not ordered, to leave the bar; the defendant was not physically compelled to leave the bar; the officer stood three feet from the defendant during the questioning and the defendant's movement was not otherwise impaired; there were no guns drawn or other show of force or authority; and the officers did not put him in handcuffs or retain possession of anything belonging to defendant to prevent him from leaving. *Id.* at 536-37; *see also United States v. Bush*, 820 F.2d 858, 861-62 (7th Cir. 1987).

A police-citizen encounter does not automatically become an arrest solely because the police draw their guns. *Shoals*, 478 F.3d at 853. For example, in *Shoals*, the police got a tip from a 911 caller that a gun had been discharged and the person that had fired the gun had run into either the garage or house at a particular address. *Id.* at 851. The police approached the house with guns drawn, and ordered the defendant to come out. *Id.* The defendant complied, and the police eventually handcuffed him. *Id.* at 851-52. The defendant argued that the police, by ordering him out of the house, having

their guns drawn, and handcuffing him, had effectuated a custodial arrest instead of a *Terry* stop. The Court of Appeals for the Seventh Circuit disagreed, stating "[t]he tactics used here were warranted given the inherent danger of the encounter." *Id.* at 853.

By contrast, in *United States v. Ienco*, the Seventh Circuit found that an arrest, not a *Terry* stop, had occurred after officers took defendants' wallets, locked the defendants in the back of a police car for thirty minutes (the car was locked and could not be opened from the inside) even after a search revealed no weapons, and never told the defendants they were free to leave. *Ienco*, 182 F.3d at 524-25. The court in *Ienco* seemed to focus on the fact that the police took the defendants' personal effects and that the police detained them for thirty minutes, even after a search revealed no weapons. *Id.* ("[T]here was no compelling need for the type or length of restraint imposed."). The court also stated: "[T]he officers retained Ienco's personal effects for a significant period of time and never told him he was free to leave, the strong indicia of an arrest, not merely a *Terry* stop."*Id.*[4]

The Seventh Circuit has articulated (in the context of a traffic stop) several factors in determining when a *Terry* stop has become an arrest: "the officer's intent in stopping the individual, whether there was a search, whether, or how much, questioning occurred, whether there was a show of force and whether the person stopped could be

---

[4] The court also cited to several other courts that had found an arrest where police retained defendant's personal items during the course of a detention. *See Florida v. Royer,* 460 U.S. 491, 501–02 (1983); *United States v. Gonzalez,* 763 F.2d 1127, 1131–32 (10th Cir. 1985); *United States v. Miller,* 589 F.2d 1117, 1127 (1st Cir. 1978).

said to have been taken into custody." *United States v. Rodriguez*, 831 F.2d 162, 166 (7th Cir. 1987). Additionally, the Supreme Court has said a routine traffic stop is more analogous to a *Terry* stop then a custodial arrest. *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984).

Applying these principles to the facts of this case, the encounter between Hultquist and defendant was not a custodial arrest from its inception. To show that a police-citizen encounter has become a custodial arrest, defendant must be "subjected to restraints of freedom such that the conditions of a formal arrest were closely approximated or actually attained." *Lennick*, 917 F.2d at 977. Comparing the facts of this case to the cases discussed above, the encounter is closer to *Shoals* and *Wyatt* than *Ienco*. Defendant was never put in the back of a squad car and he did not have anything taken from him that would prevent him from leaving, and according to the government, the encounter only lasted about ten minutes. Hultquist did request defendant come down from the stand, but this does not necessarily make it a custodial arrest. *See Shoals*, 478 F.3d at 853 (rejecting argument that police-citizen encounter became custodial arrest on account of police ordering defendant out of house, having guns drawn, and handcuffing defendant). Hultquist did have his gun drawn, but that is not necessarily dispositive. *Id.* Additionally, although the gun was drawn, it was not pointed at defendant.

The encounter also did not develop into a custodial arrest any time before defendant's formal arrest. Hultquist did ask defendant to step into the crop field and did position himself between defendant and crop field. This could be construed as

preventing "freedom of movement of the degree which the law associates with formal arrest" or that "a reasonable person in his position would have believed that he or she was not free to ignore [the law enforcement officer] and walk away." *Ienco*, 182 F.3d 517, 523; *Lennick*, 917 F.2d at 977. But, comparing this case to *Shoals*, where putting a defendant in handcuffs didn't constitute a custodial arrest because "the tactics used . . . were warranted given the inherent danger of the encounter," what Hultquist did here was justified too. *Shoals*, 478 F.3d at 851-53. Hultquist believed defendant was armed and he was concerned for his own safety. Additionally, Hultquist only had to position himself between defendant and the truck because defendant continued to move toward the truck. This action by Hultquist was only necessary because defendant was being evasive, and did not transform the encounter into a custodial arrest. *See Felix-Felix*, 275 F.3d at 636 (cornering defendant into dead end did not constitute custodial arrest because the cornering was necessitated by defendant's attempts to evade agents). However, once the altercation occurred and defendant was put into handcuffs, he was under arrest because defendant "was subjected to restraints of freedom such that the conditions of a formal arrest were closely approximated or actually attained." *Lennick*, 917 F.2d at 977.

The final issue is whether defendant was properly *Mirandized*. Defendant argued that because this encounter constituted a full custodial arrest from its inception, Hultquist was required to give *Miranda* warnings to defendant before questioning him. (DE # 29 at 4.) The government argued that prior to defendant being placed under

formal arrest, he was neither placed under arrest nor "in custody" for purposes of *Miranda*. (DE # 36 at 24.)

To determine when someone is in custody for *Miranda* purposes, the Seventh Circuit test "inquire[s] whether, under the totality of circumstances, a reasonable person in the defendant's position would have believed that he was free to leave." *United States v. Snodgrass*, 635 F.3d 324, 327 (7th Cir. 2011) (citing *United States v. Budd*, 549 F.3d 1140, 1145 (7th Cir. 2008)). The government points the court to *United States v. Murray*, in which the defendant was pulled over for not having a rear license plate. 89 F.3d 459, 461 (7th Cir. 1996). The police asked the defendant a few questions at the time of the stop, and the defendant argued the statements should be suppressed because no *Miranda* warnings were given. *Id.* at 461-62. The court focused on the "custodial interrogation" requirement of *Miranda,* and said "[t]here is no evidence in the record to support Murray's contention that his *freedom of movement was restrained*, prior to the question, in a manner equivalent to that associated with a formal arrest." *Id.* at 462 (emphasis in original). The court noted several factors in coming to this conclusion, including the short period of time between the initial stop and the questions, the fact that the questions were conducted in a lighted area in public view, and that the police did not engage in conduct that would overcome the defendant's will. *Id.* Even the fact that the defendant was questioned while in the back of the squad car did not constitute being "in custody" because "[a] reasonable person in [defendant's] position would not have considered the brief questioning at the scene to be a custodial interrogation." *Id.*

Rather, he was only "in custody" once the police told him he was under arrest and put handcuffs on him. *Id.*; *see also United States v. Kelly*, 991 F.2d 1308 (7th Cir. 1993).

The Seventh Circuit has also rejected the argument that a suspect subjected to a pat down search would not feel free to leave, and would therefore be "in custody." *Wyatt*, 179 F.3d at 536. If a suspect is not "in custody" for the purposes of *Miranda* when being questioned in the back of a police car and a suspect is not "in custody" during a pat down search by police, here, defendant was not "in custody" at any point during his encounter with Hultquist prior to his formal arrest. Defendant had not been told he was under arrest and handcuffs were not put on defendant until after the scuffle with Hultquist. The encounter before the scuffle did not last any longer than necessary. There are also no facts presented that indicate Hultquist somehow overcame defendant's will. Therefore, Hultquist was not required to give defendant *Miranda* warnings at any point before the altercation occurred.

The record does not indicate whether Hultquist told defendant he was under arrest after the altercation when Hultquist put handcuffs on defendant. But, even if he did not, defendant "was subjected to restraints of freedom such that the conditions of a formal arrest were closely approximated or actually attained," and therefore, a custodial arrest had been effectuated. *Lennick*, 917 F.2d at 977. However, defendant was not given *Miranda* warnings until after he was subdued and backup had arrived. Before defendant was given his *Miranda* warnings, Hultquist asked him for his name and also a few questions about his medical history. Defendant identified himself as Michael Weatherford in response to these questions.

At this point, defendant was "in custody." But *Miranda* warnings only apply to custodial interrogation. *United States v. Schlater*, 85 F.3d 1251, 1255-56 (7th Cir. 1996). The Supreme Court defined interrogation as: "not only . . . express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980). However, the Seventh Circuit has held questions like "what is your name" and "what is your address" do not constitute interrogation, noting those questions are not questions the police are likely to believe will lead to an incriminating response because these questions will eventually be learned at booking. *United States v. Edwards*, 885 F.2d 377, 385-86 (7th Cir. 1989). The Seventh Circuit also held that asking a defendant questions about his place of employment did not constitute interrogation because the police could not reasonably have expected that question to evoke an incriminating response. *Id.* at 686. The Seventh Circuit did not, however, articulate a broad rule exempting questions about employment from being considered interrogation. *Id.* The analysis from *Edwards* is instructive here. Hultquist could not reasonably expect his questions about defendant's name and medical history were going to evoke an incriminating response. Therefore, although these questions were asked prior to *Miranda* warnings being given, any answers given by defendant after his arrest but before receiving *Miranda* warnings will not be suppressed.

Defendant also argued that the interrogation was without a "knowing and informed waiver of rights." (DE # 29 at 2.) The right to remain silent, as one of the rights

listed in *Miranda* warnings, can be waived if done so voluntarily, knowingly, and intelligently. *Snodgrass*, 635 F.3d at 328. To determine if a waiver is voluntary, a court must analyze all of the circumstances to see if the confession is a product of rational intellect and free will, and not the result of any sort of physical or psychological abuse or deceptive interrogation tactics that might overcome defendant's free will. *Id.* Because Hultquist was not required to give defendant his *Miranda* rights until defendant was placed under formal arrest, only the statements made after formal arrest could be suppressed by an ineffective waiver. However, as mentioned above, the statements made by defendant while waiting for backup to arrive will not be suppressed. Additionally, any statements made by defendant at Warren County Sheriff's Department on November 7, 2010, will not be suppressed because there is no evidence of coercive tactics, physical abuse, or psychological abuse. The court therefore finds that the waiver of *Miranda* by defendant was voluntary, knowing, and intelligent. In sum, no statements made by defendant will be suppressed.

## V. CONCLUSION

For the foregoing reasons, defendants motion to "Motion to Suppress and Reject" (DE # 29) is **DENIED** in full.

**SO ORDERED**.

Date: November 8, 2011

s/James T. Moody_____
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT
